IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

JEFFREY LONGS,

     Plaintiff,

                            Case No. 2:07-cv-02653-JPM-cgc

FORD MOTOR COMPANY,

     Defendant.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant Ford Motor Company's ("Ford") Motion for Summary Judgment (D.E. 62), filed March 27, 2009.  Plaintiff responded on April 28, 2009 (D.E. 65), and Ford replied on May 21, 2009 (D.E. 70).  The Court held a telephonic hearing on Defendant's Motion on May 27, 2009. The attorneys present for Longs were Venita Marie Martin, Esq., and Andre B. Mathis, Esq.  The attorneys present for Ford were Stanley E. Graham, Esq., and Kristy G. Offitt, Esq.  For the reasons stated herein, Defendant's motion is GRANTED IN PART AND DENIED IN PART.

I.    BACKGROUND

Longs began working for Ford Motor Company in 2001.
(Pl.'s Resp. in Opp. to Mot. for Summ. J. ("Pl.'s Resp.")
(D.E. 65) Ex. 1, Aff. of Jeffrey Longs ("Longs Aff.") ¶ 2.)
He worked as a Parts Order Processor ("POP") at Ford's
Memphis Distribution Center ("Memphis facility") from 2003
until his termination in July 2007.  (Id.)  As a POP, Longs
was responsible for "picking" parts from shelves and
routing them to dealers.  (Def.'s Mot. for Summ. J. (D.E.
62) Ex. 7, Excerpts of Longs' Dep. ("Longs Dep.") 17:3-23.)
He was a member of the United Autoworkers Union ("UAW" or
"Union").  (Longs Aff. ¶ 3.)

A. Production Goals

Pursuant to the Ford/UAW collective bargaining
agreement ("CBA"), employees at the Memphis facility were
given a production goal – a target number of orders each
employee should pick per shift.  (Def.'s Mot. for Summ. J.
Ex. 6, Decl. of Kenneth Donaldson ("Donaldson Decl.") ¶ 5.)
Employees who reached the production goal early were
sometimes permitted to leave before the end of the shift.
(Id. ¶ 6; Am. Compl. ¶ 16; Longs Aff. ¶ 22.)

Longs alleges that in January 2006, Sean McStravick,
the Plant Operations Manager, unilaterally changed the
production goal from 400 to 600 picks per shift.  (Longs

Aff. ¶ 11; Am. Compl. ¶ 16.)[1]  According to Longs, his shift
was racially balanced between African-American and
Caucasian employees, but that there was an age disparity
between the African-American and Caucasian employees such
that older employees tended to be African-American, while
younger employees tended to be Caucasian.  (Longs Aff. ¶
9.)  Longs alleges that the production goal change
adversely affected older African-American employees because
younger Caucasian employees were routinely allowed to leave
early while older African-American employees were not
permitted to leave.[2]  (Id. ¶ 9.)

**B. Internal Complaints**

Between January and May 2006, Longs complained to his
supervisor, Mike Waper; McStravick; union representatives;
the Memphis Depot Manager; and Ford's Regional Manager that
certain practices were discriminatory.  (Longs Aff. ¶¶ 4-

---

[1] Ford denies this allegation.  (Answer ¶ 16.)  In its Motion to Strike,
Ford argues that Longs fails to present any evidence to support his
statements regarding what the production goals were or his assertion
that McStravick unilaterally changed them.  (Def.'s Mot. Strike Pl.'s
Aff. (D.E. 71) 2.)  The Court need not determine whether Plaintiff has
met the personal knowledge requirement with respect to his statements
about the production goals because this evidence is not necessary to
rebut Longs' summary judgment motion.

[2] In its Motion to Strike, Ford argues that Longs offers "no specific
dates, details or other evidence indicating the basis for his 'personal
knowledge' that these employees left early."  (Def.'s Mot. Strike Pl.'s
Aff. 2.)  Longs explained in his deposition, however, that his
knowledge is based on what he personally observed at the end of his
shifts.  (Longs Dep. 129:16-20.)  Longs' testimony about his personal
observations is admissible.

8.)  For example, in January 2006, Longs complained to Waper that "it was discriminatory to allow certain employees to leave early while others had to remain at work . . . ."  (Id. ¶ 4.)  Although Longs explained in his affidavit that he was "referring to the fact that younger, white employees were being allowed to leave work early with pay while the older, black employees had to remain at work," he admitted that his complaints mention only discrimination generally and do not refer to race or age discrimination specifically.  (Longs Dep. 127:11-14, 128:3-8, 183:4-10, 183:17-184:3; Longs Aff. ¶¶ 4-8.)

The record includes a document dated June 8, 2006, which appears to be a memorandum from Longs to Ford's Human Resources Department and to the Union.  (Pl.'s Resp. Ex. 5 ("June Memorandum").)  The memorandum details what Longs calls "Harassment, Age and Race Discrimination" from January 6, 2006 to May 31, 2006.  (Id.)  The record does not reflect whether this document was ever sent to Ford or to the Union.[3]

---

[3] Longs cites to the June Memorandum only once in his Response, offering it as support for his assertion that employees were permitted to leave early on May 26, 2006.  (See Pl.'s Resp. 6.)  The Court does not accept any of the statements in the memorandum as evidence of the truth of the matters asserted.  The contents of the document are hearsay statements if offered for their truth, and Longs has not argued that these statements fall within any exception to the hearsay rule.  See Smoot v. United Transp. Union, 246 F.3d 633, 649 (6th Cir 2001) ("[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.")

The record also includes a January 2006 grievance filed by the Union on behalf of a group of employees other than Longs. (Longs' Aff. Ex. 1, Union Grievance ("Union Grievance").)[4] The grievance alleged race and age discrimination. (Id.)

### C. Vacation Requests

From 2004 until 2007, vacation requests at Ford's Memphis Complex were generally granted on a first-come, first-served basis, based on the order of employees' signatures in a vacation request book. (Longs Dep. 107:2-17; Donaldson Decl. ¶ 7.) According to Kenneth Donaldson, a superintendent at Ford, the first three employees to request leave for a particular date were generally approved, but "supervisors could recommend the approval of additional employees based on projected shift need or extenuating circumstances." (Donaldson Decl. ¶ 8.) Supervisors verbally informed the requesting employee whether a leave request was approved or denied. (Pl.'s Resp. Ex. 9, Excerpts of Dep. of Kenneth Donaldson ("Donaldson Dep.") 79:3-80:19, 95:14-20.)

McStravick took charge of the vacation book when he transferred to Longs' building in March 2006. (Longs Aff.

---

[4] In its Motion to Strike, Ford asserts that the Union Grievance is "inadmissible hearsay." (Def.'s Mot. to Strike 3.) In the absence of any explanation or argument in support of Ford's assertion, the Court declines to rule on the hearsay issue at this stage.

¶¶ 4, 26.)  On May 3, 2006, Longs requested leave for May 26, 2006 to attend his daughter's graduation ceremony. (Id. ¶ 20.)  Longs' name was listed eleventh in the vacation book for that date.  (Pl.'s Resp. Ex. 3 ("Excused Vacation Day Listing, Week of 5/22/06").)  According to Ford, Longs' leave request was denied because he was listed eleventh on the list.  (Donaldson Dep. 92:17-22, 95:1-2.) At least five employees were approved for leave on that date, including some who were listed below Longs in the request book.[5]  (Longs Aff. ¶ 21; see also Excused Vacation Day Listing, Week of 5/22/06; Donaldson Dep. 92:23-93:6.) An additional fifteen employees were permitted to leave early on that day.  (Longs Aff. ¶ 22; see also Donaldson Dep. 95:3-13.)

**D. May 2006 Discipline**

On May 29, 2006, Longs was disciplined for being late. (Am. Compl. ¶ 20; Answer to Am. Compl. ("Answer") (D.E. 15) ¶ 20.)  Longs alleges that he was only two minutes late and

---

[5] Longs asserts that five employees were approved for leave for May 26, 2006.  (Longs Aff. ¶ 21.)  The Excused Vacation Day Listing, Week of 5/22/06 indicates that the following employees were approved for leave: (1) Melvin Griffin; (2) Gary Giles; (3) Scott Gilliam; (9) D. Franklin; and (12) Janice (last name illegible).  Donaldson testified, however, that Tony Adams, who was listed thirteenth in the vacation book, was also approved for leave on May 26.  (Donaldson Dep. 92:23-93:6.) Viewing the evidence in the light most favorable to Longs, therefore, two employees listed below him in the vacation book were approved for leave on May 26, 2006: Janice (12) and Tony Adams (13).

that Ford had a seven minute grace period. (Am. Compl. ¶
20.)

### E. July 2006 EEOC Charge

On July 14, 2006, Longs filed a Charge of
Discrimination against Ford with the Equal Employment
Opportunity Commission ("EEOC"), alleging race
discrimination, age discrimination, and retaliation.
(Longs Dep. Ex. 5, Charge of Discrimination ("July 2006
EEOC Charge"); Longs Aff. ¶ 24.)  The charge asserted
unfair disciplinary actions, wrongful denial of Longs'
vacation leave on May 26, 2006, and unfair treatment.
(Id.)  Ford responded to the EEOC regarding Longs' charge
on August 21, 2006.  (Pl.'s Resp. Ex. 7, FMC August 21,
2006 Response to EEOC ("Ford EEOC Response").)

### F. Medical Fraud Discharge and Reinstatement

In September or October 2006, Longs injured his finger
and was placed on light duty work restrictions.  (Longs
Aff. ¶ 27.)  Longs continued to report to work as scheduled
and was assigned to his regular duties.  (Id.)  Longs
alleges that Ford hired a private investigator who observed
him mowing his lawn.  (Id. ¶ 28.)  Longs was discharged for
medical fraud on November 6, 2006.  (Answer ¶ 23.)
Following his termination, Longs filed a grievance with the
Union.  (Longs Aff. ¶ 29.)  Longs denies Ford's accusations

that he committed medical fraud.  (Longs Dep. 144:19-24;
Longs Aff. ¶ 30.)

On December 4, 2006, Longs signed a Reinstatement
Waiver as a condition of reinstatement to his employment
with Ford.  (Def.'s Mot. for Summ. J. Ex. 4, Reinstatement
Waiver; Longs Aff. ¶ 30; Longs Dep. 144:25-145:4.)  The
waiver provided that Longs could be terminated for any
infraction in the next twelve months and denied Longs
access to the grievance procedure to protest the
reasonableness of disciplinary penalties during that time
period.  (Reinstatement Waiver.)

**G. March 2007 Discipline**

Longs alleges that, following his reinstatement,
McStravick and other managers began to closely monitor his
work.  (Longs Aff. ¶ 32.)  Longs was counseled for three
"replenishment error[s]" which occurred between March 7 and
15, 2007.  (Longs Aff. ¶ 32; Longs Aff. Ex. 2, Error
Reports)  On March 26, 2007, the Union filed a grievance
alleging that Ford unjustly disciplined Longs for errors he
did not make.  (Id. Ex. 4, Longs Union Grievance.)

**H. July 2007 Leave**

In February 2007, Longs asked his then-supervisor, Don
Bordes, if he could take vacation on Friday, July 13, 2007
and Monday, July 16, 2007 to attend a family reunion.

(Longs Aff. ¶ 33.)  In response, Bordes provided Longs with
the vacation book, in which Longs claims to have written
his name on the first line for both dates.  (Id.)  During
the week of July 9, 2007, Longs went to examine the
vacation book after learning from another employee that
others were complaining that their names were no longer in
the book.  (Id. ¶ 34.)  Longs noticed that his name did not
appear in the vacation book for July 13 and 16, 2007 – the
dates for which he asserts his leave request had previously
been approved.  (Id. ¶¶ 34-36.)

When Longs asked McStravick for the book he had signed
in February, McStravick responded that the vacation book on
his desk was the only one.  (Id. ¶ 34.)  In response to
Longs' complaint that he had already been approved for
leave, McStravick told Longs to put his name in the book
and "maybe [he] would be approved, maybe [he] would not."
(Id. ¶ 35.)  McStravick told Longs that he (McStravick)
"could do whatever he wanted to do."  (Id.)  In the "new"
book, Longs name was listed seventh for July 13 and fifth
for July 16.  (Longs Dep. Ex. 12 ("Excused Vacation Day
Listing, Week of 7/9/07"), Ex. 13 ("Excused Vacation Day
Listing, Week of 7/16/07").)

Longs does not know what happened to the pages he
signed in February.  (Longs Dep. 158:25-159:9.)  Longs also

submitted the unsworn statements of three employees who expressed confusion and concern over changes to the vacation book. (Pl.'s Resp. Ex. 8 ("Unsworn Employee Statements").)

Longs did not report to work on July 13 and 16, 2007 because, according to Longs, his supervisor had previously approved his leave request for those dates. (Longs Aff. ¶ 36.) Longs claims that the CBA does not allow Ford to rescind approved vacation leave without the employee's consent. (<u>Id.</u>)[6]

### I. EEOC Notice of Right to Sue

On July 13, 2007, the EEOC mailed a Dismissal and Notice of Rights letter ("Notice of Right to Sue" or "Notice") for Longs' July 2006 EEOC charge. (Pl.'s Resp. Ex. 6, July EEOC Notice)  Longs states that he received the Notice at his home in Bartlett, Tennessee on Monday, July 16, 2007. (<u>Id.</u>) Da'Lana Holmes, a Human Resource Associate at Ford, states that she received the Notice on July 20, 2007, after the termination hearing and that this was the first she learned of the EEOC charge. (Declaration of Da'Lana E. Holmes (D.E. 62-4) ("Holmes Decl.") ¶ 10.)

---

[6] Contrary to Ford's argument in its Motion to Strike, Longs filed the portion of the CBA which is the basis for his belief that the CBA does not permit Ford to rescind vacation time once it has been approved. (<u>See</u> Pl.'s Resp. Ex. 2, Vacation Leave Policy.)

**J. Termination Decision**

Holmes transferred to the Memphis Facility on July 9, 2007. (Id. ¶ 2.)  She reviewed the attendance logs daily to determine which employees were absent or late. (Id. ¶ 3.)  If she found an employee was absent without leave, Holmes was responsible for determining and imposing the proper disciplinary actions after considering factors such as prior attendance, disciplinary records, and whether the employee was subject to a waiver. (Id. ¶ 4.)

Holmes learned that Longs was absent on July 13 and 16, 2007 by reviewing the attendance logs. (Id. ¶ 5.)  She asked McStravick whether Longs had requested leave, and McStravick responded that Longs' leave request had been denied. (Excerpts of Dep. of Sean McStravick (D.E. 62-9) ("McStravick Dep.") 51:6-52-5; Holmes Decl. ¶ 5.)  Holmes then reviewed Longs' past attendance and disciplinary records and learned of his reinstatement agreement. (Holmes Decl. ¶ 6.)  According to Holmes, absence without leave while on a reinstatement waiver is grounds for termination. (Id.)

Holmes scheduled a termination meeting for July 17, 18, or 19, 2007. (Id. ¶ 8; Longs Dep. 147:10-25.)[7]  Present

---

[7]  Longs testified that the meeting was held on either July 17 or July 18 and that the meeting could not have been held on July 19 (Longs Dep.

at the meeting were Longs, his union representative, Holmes, and McStravick.  (Holmes Decl. ¶ 9; see also McStravick Dep. 101:3-15; Longs Aff. ¶ 37.)  Holmes alleges that the July termination meeting was the first time she had met Longs.  (Holmes Decl. ¶ 9.)  According to Holmes, Longs admitted at the meeting that his supervisor did not confirm that Longs was approved for leave, and Longs did not provide a reasonable explanation for his absences. (Id. ¶ 9.)  At the conclusion of the meeting, Holmes concluded that termination was the proper disciplinary action and informed Longs of her decision.  (Id.)

Longs does not know which individual or individuals made the final decision to discharge him (Longs Dep. 59:7-9, 60:8-10), but he believes that Holmes and other members of the management team, including McStravick, were involved.  (Id. at 58:15-60:10.)[8]

**K. After the Termination**

On September 20, 2007, Longs filed a grievance with the National Labor Relations Board ("NLRB") alleging that

---

147:15-17).  According to Holmes, the termination meeting took place July 19, 2007.  (Holmes Decl. ¶ 9.)

[8] Longs testified that he believed McStravick recommended the termination decision because McStravick was present at the meeting and because Longs' union representative told him that McStravick recommended the discharge.  (Longs Dep. 59:13-60:7.)  McStravick's alleged statement to the union representative is hearsay and Longs has not argued that it fits within any hearsay exception.  Accordingly, the Court will not consider this statement for the truth of the matter asserted.

Ford discharged him "to retaliate against him after he assumed the position of Recording Secretary for the UAW Local 30-06, the certified collective bargaining representative of bargaining unit employees."  (Longs Dep. (D.E. 62-8) Ex. 3, NLRB Grievance.)

On October 5, 2007, Longs filed an EEOC charge, alleging that Ford retaliated against him for filing the July 2006 EEOC charge.  (Longs Dep. (D.E. 62-8) Ex. 11; Longs Aff. ¶ 38.)  Longs based his retaliation charge on the close temporal proximity between his receipt of the Right to Sue Notice and his termination.  (Longs Dep. Ex. 11, 2007 EEOC Charge.)

Longs filed the instant lawsuit on October 10, 2007 (D.E. 1), and amended his complaint on April 11, 2008 (D.E. 12).  This case is set for trial on September 28, 2009.

## II.   STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  So long as the movant has met its initial burden of "demonstrat[ing] the absence of a

genuine issue of material fact," Celotex, 477 U.S. at 323,
and the nonmoving party is unable to make such a showing,
summary judgment is appropriate.  Emmons v. McLaughlin, 874
F.2d 351, 353 (6th Cir. 1989).  In considering a motion for
summary judgment, however, "the evidence as well as all
inferences drawn therefrom must be read in a light most
favorable to the party opposing the motion."  Kochins v.
Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986);
see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986).

     When confronted with a properly supported motion for
summary judgment, the nonmoving party "must – by affidavits
or as otherwise provided in this rule – set out specific
facts showing a genuine issue for trial."  Fed. R. Civ. P.
56(e)(2); see also Abeita v. TransAm. Mailings, Inc., 159
F.3d 246, 250 (6th Cir. 1998).  However, "'[t]he mere
existence of a scintilla of evidence in support of the
plaintiff's position will be insufficient.'"  Street v.
J.C. Bradford & Co., Inc., 886 F.2d 1472, 1479 (6th Cir.
1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 252 (1986)).

     A genuine issue of material fact exists for trial "if
the evidence [presented by the nonmoving party] is such
that a reasonable jury could return a verdict for the

nonmoving party." <u>Anderson</u>, 477 U.S. at 248.  In essence,
the inquiry is "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it
is so one-sided that one party must prevail as a matter of
law."  <u>Id.</u> at 251-52.

**III. ANALYSIS**

    Longs brings the following claims: (A) discrimination
in the form of disparate treatment on the basis of race[9];
(B) discrimination in the form of policies with a disparate
impact on older African-American employees; and (C)
retaliation.  Ford moves for summary judgment on each
claim.  For the following reasons, the Court GRANTS Ford's
Motion as to the discrimination claims and DENIES Ford's
Motion as to the retaliation claim.

    **A. Race Discrimination: Disparate Treatment**

    Title VII makes it unlawful for an employer to
"discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of

---

[9] Longs' Response also refers to a disparate treatment claim based on
age.  The only age-based claim, however, is a disparate impact claim.
Longs alleges that Ford discriminated against older employees in the
assignment of tasks and performance of job duties and that Ford set
"arbitrary quotas for production" which disparately impacted older
employees.  (Am. Compl. ¶¶ 31, 33.)  While the assignment of tasks and
duties could, in some circumstances, be adverse employment actions,
Longs' Response makes clear that the "reassignment" is his
characterization of Ford's increased production quota: "Essentially,
employees were 'reassigned' the responsibility of producing 600 lines,
instead of the negotiated 400 lines."  (Pl.'s Resp. 19.)  This claim is
addressed as a disparate impact claim.

employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff may present direct evidence of race discrimination or may establish her case through circumstantial evidence using the McDonnell Douglas burden-shifting paradigm. See Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997), reh'g and reh'g en banc denied; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803 (1973).

Because Longs presents only circumstantial evidence to support his claims of discrimination, his claims are analyzed under the McDonnell Douglas framework. Under this framework, Plaintiff must first make out a prima facie case of discrimination by showing that (1) he is a member of a protected group; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) similarly-situated non-protected employees were treated more favorably. Kline, 128 F.3d at 348; see also McDonnell Douglas, 411 U.S. at 803.

Ford does not dispute that Longs is a member of a protected group and was qualified for his previous position at the Memphis Complex. Ford argues, however, that Longs did not suffer a materially adverse employment action and that Longs has not identified any similarly-situated

employees outside the class who were treated more favorably.  (Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Support Mem.") 10-11.)

In his response, Longs points to the following adverse employment actions: the increased production goal (which Longs characterizes as a "reassignment" from the task of producing 400 lines to the responsibility of producing 600 lines) and modification of the vacation books. (Pl.'s Resp. 19-20.)  In his complaint, Longs alleges that he was denied vacation and personal leave, subjected to scrutiny and harsher discipline, and given the "cold shoulder" by management because of his race.[10]  (Am. Compl. ¶ 28.)  The Court need not determine which, if any, of these alleged actions were materially adverse because Longs has not pointed to any similarly-situated employee outside the protected class who was treated more favorably.

The new production goals applied to each employee on Longs' shift regardless of race.  Accordingly, the goals do not support a claim for disparate treatment based on race. Longs' claim that the policy had a disparate impact on older African-American employees is treated below as a disparate impact claim.

---

[10] Longs does not allege or argue that his July 2007 termination was racially motivated.

17

With respect to the vacation book, Longs asserts that
"[t]he arbitrary and malicious modifications of the
vacation and leave books were also aimed at African-
American employees, adversely affecting work hours and
benefits . . . ." (Pl.'s Resp. 19.)  Longs does not point
to evidence, however, to support his allegation that the
modifications were aimed at African-American employees or
that he was denied leave in July 2007 because of his race.
He does not identify a single similarly situated non-
African-American employee whose vacation requests were not
altered, nor does he point to evidence that those employees
who were granted vacation leave on his requested dates were
not African-American.  In the absence of evidence that
employees whose names were allegedly removed from the books
were disproportionately African-American, or other evidence
that the modifications were motivated by racial animus,
Longs has shown only that Ford's vacation policy may be
unfair.

Similarly, Longs fails to present evidence that
similarly situated non-African-American employees were
treated more favorably with respect to the allegedly
adverse actions listed in his complaint.  He presents
evidence that two employees listed below him in the
vacation book for May 26, 2006 were approved for vacation

that day, but he does not present evidence of their
race(s).  Of the three employees listed first and approved
for leave on May 26, 2006, two are African-American (Melvin
Griffin and Gary Giles) and one is Caucasian (Scott
Gilliam).  (Longs Dep. 115:7-17; Excused Vacation Day
Listing, Week of 5/22/06.)  Although Longs presents
evidence that he was scrutinized by management by the use
of a private investigator, he presents no evidence that
non-African-American employees were not subjected to
scrutiny when placed on medical work restrictions.  In
support, he points to discipline for arriving two minutes
late and to multiple citations during March 2007.  Although
he asserts a general seven minute grace period, Longs fails
to present any evidence of that policy or to identify a
single similarly situated employee who was not disciplined
for being two minutes late.  Finally, Longs does not point
to similarly situated employees who were not similarly
counseled or disciplined for the alleged replenishment
errors in March 2007.[11]

---

[11] The Court also notes that Longs does not present evidence that the
March 2007 discipline was a "materially adverse change in the terms and
conditions of employment" that was "more disruptive than a mere
inconvenience or an alteration of job responsibilities." Hollins v.
Atl. Co., 188 F.3d 652, 662 (6th Cir 1999).  The discipline was not a
termination, demotion, decrease in wage or salary, change in title,
material loss of benefits, or diminishment in responsibilities.  See
id.

For these reasons, Longs has failed to establish a prima facie case of race discrimination based on disparate treatment.  As to his race discrimination claim, Ford's motion for summary judgment is GRANTED.

**B. Disparate Impact Claim**

To establish a prima facie case of discrimination under a disparate impact theory, the plaintiff must (1) identify "a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[] that the challenged practice has an adverse impact on a protected group."  Isabel v. City of Memphis, 404 F.3d 404, 411 (6th Cir. 2005).[12]

The "relevant statistical analysis" requirement is not limited to any particular type or method, Isabel, 404 F.3d at 411-412 (quoting Johnson v. U.S. Dept. of Health and Human Servs., 30 F.3d 45, 48 (6th Cir. 1994) and Teamsters v. United States, 431 U.S. 324, 339-40 (1977)), but a "complete failure to make any such statistical showing is

---

[12] Longs' disparate impact claim alleges both age and race discrimination and thus implicates both the Age Discrimination in Employment Act ("ADEA") and Title VII.  For purposes of this case, the differences between a disparate impact claim under the ADEA and under Title VII are immaterial.  See Butts v. McCullough, 237 Fed. Appx. 1, at *9 (6th Cir. 2007) (analyzing ADEA claim based on Title VII prima facie case for disparate impact, as articulated in Isabel).  "[T]he scope of disparate-impact liability under ADEA is narrower than under Title VII" because of the reasonable factors other than age ("RFOA") provision and because of the 1991 amendments to Title VII.  Smith v. City of Jackson, 544 U.S. 228, 240 (2005).  Neither the RFOA provision nor the 1991 amendments are relevant to this case.

fatal . . . ."  <u>Adams v. Lucent Tech., Inc.</u>, 284 Fed. Appx.
296, 304 (6th Cir. 2008) (quoting <u>Butts v. McCullough</u>, 237
Fed. Appx. 1, 9 (6th Cir. 2007)).

Longs asserts that "arbitrary quotas for production"
had a disparate impact on older African-American workers.
(Am. Compl. ¶ 33; Pl.'s Resp. 19.)[13]  Longs claims that the
increased production goals and the policy of permitting
employees who met the goals to leave early adversely
affected older African-American workers, who generally did
not finish early.  (Longs Aff. ¶¶ 4-5, 9-10.)  He also
argues that older employees were disciplined for failing to
work as quickly as younger employees.  (Pl.'s Resp. 21.)

Longs has not provided any relevant statistical
analysis to support his claim of disparate impact.
Instead, he relies on his personal observations that
younger Caucasian employees were permitted to go home,
while older African-American employees remained at work
until the end of the shift.  He provides the Court with the
following observations: his twenty to twenty-five person
shift was racially balanced; the Caucasian employees on the
shift were generally younger than the African-American

---

[13] Although Longs does not explicitly include a claim for disparate
impact based on race in his Amended Complaint, his Response indicates
that the race discrimination claim in his complaint refers, in part, to
an alleged disparate impact on African-American employees as a result
of the increased production goals.  (Pl.'s Resp. 19.)

employees; six younger Caucasian employees were routinely allowed to leave early; four older African-American employees were not permitted to leave early. (Longs Aff. ¶ 9.)  In addition, Longs points to the grievance filed by the Union on behalf of several employees (other than Longs), expressing concern that these employees were being discriminated against based on race and age.  (Union Grievance.)  Some of the concerns expressed in this grievance related to discipline for underperformance. (Id.)  Longs also relies on his own March 2007 disciplinary actions.

The Court does not find Longs' observations and anecdotal evidence sufficient to qualify as "relevant statistical analysis."  Compare Isabel, 404 F.3d 404 (referring to the use of T-tests and Z-test as "statistical analyses" which could be used to show adverse impact) with Craig v. Cont'l Pet Tech., Inc., 2006 WL 2792337, at *6 (E.D. Ky. Sept. 26, 2006) (finding that Plaintiff's reliance on testimony that practice affected only women was not statistical analysis).  Accordingly, Longs has not satisfied the second element of his prima facie case that the increased production requirement had a disparate impact on older or African American employees and Ford is entitled to judgment as a matter of law on that claim.

As to Longs' disparate impact claim, Ford's motion for summary judgment is GRANTED.

### C.   Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Unlawful employment practices under Title VII include actions taken because of race, color, religion, sex or national origin that discriminate with respect to "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2, and employment practices that are facially neutral but have a disparate impact on a racial, religious, or other group protected under the statute, Griggs v. Duke Power Co., 401 U.S. 424 (1971).

Similarly, the ADEA makes it unlawful for an employer to "discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section . . . or because such individual . . . has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or

litigation under this chapter."  29 U.S.C. § 623(d).

Unlawful employment practices under the ADEA include
actions taken because of an individual's age that
discriminate with respect to the "compensation, terms,
conditions, or privileges of employment," 29 U.S.C. §
623(a)(1), and some facially neutral employment practices
that have a disparate impact on employees in a certain age
group, Smith v. City of Jackson, Miss., 544 U.S. 228
(2005).

In the absence of direct evidence of retaliation,
courts analyze Title VII and ADEA retaliation claims at the
summary judgment stage using the McDonnell Douglas burden-
shifting framework.  Imwalle v. Reliance Medic. Prod.,
Inc., 515 F.3d 531, 544 (6th Cir. 2008).  Under this
framework, the plaintiff has the initial burden to
establish a prima facie case of retaliation by showing: (1)
he engaged in a protected activity; (2) defendant knew he
engaged in the protected activity; (3) defendant
subsequently took an adverse action against him; and (4)
there was a causal connection between the protected
activity and the adverse action.  Id.

Once the plaintiff presents sufficient evidence to
establish his prima facie case, the burden then shifts to
the employer to "produce evidence of a legitimate,

nondiscriminatory reason for the adverse employment action." Id.  The plaintiff must then show that defendant's proferred reason for the adverse action was a pretext for intentional retaliation.  Id.

### i. Prima Facie Case

The parties disagree about which of Longs complaints qualify as protected activities under Title VII and the ADEA (element one), knowledge (element two), and causation (element four).  There is no dispute that Longs' termination in July 2007 was an adverse employment action.

### a. Protected Activities

The parties agree that Longs' formal EEOC charge in July 2006 was a protected activity, but disagree as to whether Longs' internal complaints between January and June 2006, including the June Memorandum, were protected activities under Title VII and the ADEA.[14]

"[A]n employee need not file a formal EEOC complaint to engage in protected activity . . . ." Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007).  A "vague charge of discrimination in an internal letter or memorandum," however, "is insufficient to constitute opposition to an unlawful employment practice."  Booker v.

---

[14] Although Longs does not specifically point to the June Memorandum as a protected activity, the Court understands his reference to "multiple complaints to management" to include the June Memorandum.  (Pl.'s Resp. 12.)

Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th
Cir. 1989).

"Although filing an official complaint with an
employer may constitute statutorily protected activity
under Title VII, the complaint must indicate that
discrimination occurred because of sex, race, national
origin, or some other protected class." Tomanovich v. City
of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006)
(citations omitted). "Merely complaining in general terms
of discrimination or harassment, without indicating a
connection to a protected class or providing facts
sufficient to create that inference, is insufficient."
Id.; Tropp v. Inglass Mem. Hosp., 2007 WL 869555, at *15
(N.D. Ill. March 21, 2007) ("[S]tatements that complain of
discrimination generally, without the context of age,
cannot constitute a protected activity."); see also Offutt
v. Warren County Reg'l Jail, 109 Fed. Appx. 740, 743 (6th
Cir. 2004) (finding no protected activity under Title VII
where employee "never indicated that her opposition was
based on Title VII"); Mikols v. Reed City Power Line Supply
Co., 2008 WL 2696925, at * 6 (W.D. Mich. July 1, 2008)
(finding no protected activity where employee's general
comments about "treating people equitably" did not "inform
the employer that gender discrimination" was employee's

concern); <u>Johnson v. Potter</u>, 2009 WL 368366, at * 9 (W.D. Tenn. Feb. 12, 2009) (finding no protected activity where "there is no evidence in the record to reflect that [employee] complained to [employer] about unlawful discrimination on the basis of a protected characteristic").

Longs points to his "multiple complaints to management" and his July 2006 EEOC charge as protected activities.[15] (Pl.'s Resp. 12.) Ford argues, however, that Longs' internal complaints of discrimination were not protected conduct because Longs admits that he never specifically referenced race or age. (Def.'s Reply to Resp. to Mot. for Summ. J. (D.E. 70) ("Def.'s Reply") 1.) Longs explains that he was "referring to the fact that younger, white employees were being allowed to leave work early with pay while the older, black employees had to remain at work," but it is undisputed that his complaints mentioned only discrimination generally and not race or age specifically. (Longs Dep. 127:11-14, 128:3-8, 183:4-10, 183:17-184:3; Longs Aff. ¶¶ 4-8.) Longs' general complaints of discrimination, which neither referred to a protected class nor provided facts sufficient to create

---

[15] Longs also relies on a union grievance filed by other workers on January 26, 2009. Because there is no evidence that Longs participated or was involved in this grievance, it cannot be a protected activity for purposes of his retaliation claim.

that inference, are "insufficient to constitute opposition
to an unlawful employment practice." <u>Booker</u>, 879 F.2d at
1313 (6th Cir. 1989); <u>see</u> <u>Tomanovich</u>, 457 F.3d at 663.  The
Court concludes, therefore, that Longs' internal complaints
to management between January and May 2006 were not
protected activities under Title VII or the ADEA.

   With respect to the June Memorandum, however, Longs
has presented sufficient evidence that the letter was in
opposition to unlawful employment practices under Title VII
and the ADEA.  The June Memorandum specifically references
age discrimination, race discrimination, federal
antidiscrimination laws, and the specific employment
practice he alleged had a disparate impact on older and
African-American employees.  (June Memorandum.)  Longs'
specific opposition to practices based on their impact on
racial and age groups is sufficient evidence that his June
2006 letter was a protected activity under Title VII and
the ADEA.

   Longs presents sufficient evidence that he engaged in
two activities protected by Title VII and the ADEA: (1) the
June Memorandum and (2) the July 2006 EEOC charge.

   **b. Knowledge of the Protected Activities**

   Ford argues that Longs cannot establish a prima facie
case of retaliation because the sole decision-maker,

Holmes, did not know of Longs' EEOC charge prior to the discharge.  (Def.'s Support Mem. 5-6; Def.'s Reply 2.)  In response, Longs argues that (a) a jury could infer that Holmes received the EEOC Notice of Right to Sue before the termination (Pl.'s Resp. 9-10); and (b) even if Holmes did not know, Sean McStravick was also involved in the termination decision and knew of Longs' internal complaints.  (Pl.'s Resp. 12-13.)  The Court addresses each argument in turn.

### 1. Holmes' Knowledge

Based on the July 13 mailing date and Longs' testimony that he received the EEOC Notice of Right to Sue in Bartlett on July 16, there is a genuine issue of material fact as to whether Holmes received the letter in the days before Longs' termination.  Furthermore, Holmes stated that she reviewed Longs' attendance and disciplinary records prior to the termination meeting.  (Holmes Decl. ¶ 6.) Even if Holmes did not receive the EEOC Notice until July 20, a reasonable jury could conclude that Holmes' review of Longs' record would have revealed the June Memorandum or the July 2006 EEOC charge.  Accordingly, there remains a genuine issue of material fact as to whether Holmes knew of Longs' EEOC complaint when Longs was terminated.

### 2. McStravick's Knowledge

Longs argues that evidence of Sean McStravick's knowledge of Longs' protected activities satisfies the second element of his prima facie case because McStravick was involved in the termination decision.

The Court agrees.  A supervisor's knowledge and motives are relevant to the retaliation analysis if the supervisor "contributed significantly" to and was "meaningfully involved" in the termination decision.  Wells v. New Cherokee Corp., 58 F.3d 233, 238 (6th Cir. 1995); see also Arendale v. City of Memphis, 519 F.3d 587, 604 n.13 (6th Cir. 2008) ("When an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' . . . theory of liability."); Nemet v. First Nat'l Bank of Ohio, 198 F.3d 246, at *6 (table) (6th Cir. 1999) (holding that employer may not shield itself from liability by having one manager make adverse decision in reliance on another manager's information without independent investigation).

It is undisputed that McStravick informed Holmes that Longs was not approved for leave on the relevant dates and that Holmes used that information in making the decision to

terminate Longs.  (Holmes Decl. ¶¶ 4-6; McStravick Dep. 51:6-52:5.)  It is also undisputed that McStravick was present at the termination meeting.  (Holmes Decl. ¶ 9; McStravick Dep. 101:3-5.)  Viewing this evidence in the light most favorable to Longs, a reasonable jury could conclude that McStravick "contributed significantly" to and was "meaningfully involved" in the termination decision. Accordingly, Longs may satisfy the second element of his prima facie case by showing that McStravick knew of his protected activities at the time of his statements to Holmes, regardless of whether Holmes knew of the protected activities at the time of the termination decision.

McStravick's knowledge of the June 2006 letter or the July 2006 EEOC charge may be established with direct evidence or may be inferred from circumstantial evidence in the record.  <u>Scott v. Eastman Chem. Co.</u>, 275 Fed. Appx. 466, 482 (6th Cir. 2008).  Longs argues that McStravick's position as his manager, combined with Longs' reference to McStravick in the EEOC charge, is sufficient circumstantial evidence from which a reasonable factfinder could infer that McStravick knew of the EEOC charge.  (<u>See</u> Pl.'s Resp. 12-13.)  Ford argues that Longs "proferred no evidence that McStravick was aware of his charge or any other of his alleged protected activities" (Def.'s Reply 3), but Ford

does not offer evidence that McStravick has denied
knowledge of the protected activities.  On the present
record, there remains a genuine issue of material fact as
to whether McStravick knew of Longs' protected activities.
Accordingly, Ford is not entitled to summary judgment on
that basis.

### c. Causation

Next, Ford argues that Longs cannot establish a prima
facie case of retaliation because he cannot show a causal
connection between his protected activities and July 2007
termination.

When an adverse employment action occurs very close in
time after the employer learns of a protected activity,
temporal proximity alone may be enough to establish the
causation element of the prima facie case.  Mickey v.
Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir.
2007).  "But where some time elapses between when the
employer learns of the protected activity and the
subsequent adverse employment action, the employee must
couple temporal proximity with other evidence of
retaliatory conduct to establish causality."  Id.

### 1. Holmes

With respect to Ms. Holmes' involvement in the
termination decision, temporal proximity alone is

sufficient to establish the causation element of Longs'
prima facie case.  If Ms. Holmes learned of the EEOC charge
prior to the termination decision, she obtained that
knowledge on July 16, 17, 18, or 19, 2007.  Longs was
terminated on July 17, 18, or 19, 2007.  Viewing the
evidence in the light most favorable to Longs, a reasonable
jury could conclude that Holmes made the decision to
terminate Longs within days or the same day she learned of
the EEOC charge.

## 2. McStravick

With respect to McStravick's involvement in the
termination decision, temporal proximity alone is not
sufficient to establish causation.  Although Longs asserts
that he complained and suffered subsequent retaliation for
eighteen months (Pl.'s Resp. 13), the admissible evidence
supports a conclusion that Longs complained informally from
January to May 2006, that he sent a written complaint to
Human Resources in June 2006, and that he filed an EEOC
charge in July 2006.[16]   (Longs Aff. ¶¶ 4, 6-8.)  Longs
points to no evidence that he engaged in any protected
activity after July 14, 2006.  Longs' termination on
approximately July 17, 2007, more than one year later, is

---

[16] Longs' second EEOC charge, filed October 5, 2007, came after his
termination and cannot be the protected activity for his retaliation
claim.

not close enough in time to establish causation based on
temporal proximity alone.  See Hamilton v. Starcom
Mediavest Group, Inc., 522 F.3d 623, 629 (6th Cir. 2008)
("[P]roximity alone generally will not suffice where the
adverse action occurs more than a few months – let alone
nine months – after the protected conduct."); see also
Arendale, 519 F.3d at 606-07 (two months between EEOC
complaint and suspension insufficient, standing alone, to
support causal connection); Cooper v. City of North
Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) (four months
between complaint and discharge insufficient, standing
alone, to support inference of retaliation); cf. Mickey,
516 F.3d at 525-26 (adverse action on same day employer
learned of protected activity sufficient for causation).

Similarly, the alleged alteration of the vacation
book, which arguably led to Longs' eventual termination,
was too remote in time to support a finding of causation
based on temporal proximity alone.  Viewing the evidence in
the light most favorable to Longs, McStravick removed
Longs' name from the vacation book in February 2007, seven
months after Longs' July 2006 EEOC charge and eight months
after the June Memorandum.[17]  Standing alone this lapse in

---

[17] Longs' testimony is sufficient evidence from which a reasonable jury
could conclude that McStravick altered the vacation book sometime after
February 2007, when Longs requested leave for July 13 and 16, 2007 from

time does not support a finding that the vacation book was altered in retaliation for Longs' complaints.

Finally, Longs cannot rely on the close temporal proximity between Ford's receipt of his Right to Sue Letter and his termination to establish causation.  While a defendant's receipt of a Right to Sue letter may be relevant to the causation inquiry if the defendant had no prior knowledge of the employee's protected conduct, issuance of a Right to Sue Letter is not itself a protected activity.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  Longs cannot argue that those involved in his termination decision did not have knowledge of his protected activities until they received the Right to Sue Letter.  Such an argument would be inconsistent with his theory of "continuous" retaliation and his arguments that he was subjected to an "atmosphere of retaliatory conduct" for over a year leading up to his final termination. (Pl.'s Resp. 13-15.)  Longs' theory that he was subjected to continuous retaliation for his protected activities requires a finding that someone involved in the termination decision knew of his protected activities before July 2007.

---

Don Bordes and wrote his name in the vacation book, and before July 2007, when Longs discovered the alleged alterations.

Furthermore, to establish the knowledge requirement of his prima facie case, Longs argues that McStravick knew of his "lengthy timeline of protected activity" and that McStravick was involved in the termination decision. (Pl.'s Resp. 12.)  Longs cannot also argue that those involved in the termination decision had no knowledge of his protected activities until Ford received the EEOC Notice of Right to Sue.  As it related to McStravick's involvement in the termination, the timing between Ford's receipt of the EEOC Notice and Longs' termination is not evidence of causation.

Because Longs cannot establish causation based on temporal proximity alone, he must point to other evidence of retaliation to satisfy the causation element of his prima facie case.  See Mickey, 516 F.3d at 525; see also Clay v. United Parcel Serv., Inc., 501 F.3d 695, 718 (6th Cir. 2007).  Additional circumstantial evidence of retaliation could include, for example, evidence that the employer treated plaintiff differently than similarly situated employees who did not engage in protected activity (see Barrett v. Whirlpool Corp., 556 F.3d 502, 517 (6th Cir. 2009), supervisor comments that reflect a retaliatory animus, (Imwalle, 515 F.3d at 549-50; Harris v. Bornhorst, 513 F.3d 503, 519-20 (6th Cir. 2008)), or evidence of

increased scrutiny following the protected activity
(Hamilton v. Gen. Elec. Co., 556 F.3d 428, 435-36 (6th Cir.
2009)(citing Jones v. Potter, 488 F.3d 397, 408 (6th Cir.
2007)).)  Other evidence of retaliation could include
"additional discrimination occurring between the date at
which the employer learned of the protected activity and
the date of termination . . . ."  Mickey, 516 F.3d at 526.

Longs presents evidence that Ford subjected him to
increased scrutiny and unearned discipline in the months
following his complaints.  Specifically, Ford hired a
private investigator to watch Longs at home following a
work injury in September or October 2006 and monitored his
work closely when he returned to work in December. (Longs
Aff. ¶¶ 28, 32.)  In November 2006, Ford terminated him for
medical fraud, although Longs maintains that he did nothing
wrong.  (Id. ¶¶ 28-30.)  In March 2007, Longs was cited
repeatedly for errors he and the Union claimed he did not
commit.  (Id. ¶ 32; March Union Grievance.)  Finally,
Longs' testimony that he signed the vacation book in
February 2007 and his name was not longer listed in July
2007 is evidence that Ford modified the vacation book such
that his name was no longer listed first for July 13 and
16, 2007.

Taken together, and viewed in the light most favorable
to Longs, the increased scrutiny, unjustified discipline,
and unfair denial of vacation leave in the year between
Longs' protected activities and his final termination is
evidence that Ford may have harbored some retaliatory
animus for Longs' protected activities.  Accordingly, this
evidence is sufficient to permit a reasonable jury to infer
that Longs' termination in July 2007 was motivated by
retaliation for his protected complaints.

### ii.    Ford's Legitimate Non-Retaliatory Reason and Longs' Showing of Pretext

Ford points to Holmes' good faith belief that Longs
was absent without leave while on a reinstatement waiver as
its legitimate, non-retaliatory reason for terminating
Longs.  (Def.'s Support Mem. 8-9.)  Ford argues that even
if Holmes' belief was incorrect, Longs can establish only
that his discharge was made in error, not that it was made
with a retaliatory motive.  (Def.'s Reply 4.)

The Court disagrees.  The Court has already explained
that a reasonable jury could find that McStravick
substantially influenced the decision to terminate Longs by
telling Holmes that Longs was not approved for leave.
Longs may establish pretext, therefore, by presenting
sufficient evidence that *McStravick* did not honestly

believe Longs was absent without leave.   Longs has met this
burden.   According to Longs, he listed his name first in
the vacation book for July 13 and 16, 2007 and Don Bordes
approved his request.   Longs presents evidence that the
vacation book was subsequently altered or replaced and that
McStravick was in charge of the vacation book during the
relevant time period.   He asserts that when he confronted
McStravick about the missing vacation book and explained
that he had already been approved for leave, McStavick
replied that McStravick could "do whatever he wanted to
do."   (Longs Aff. ¶ 35.)   Viewing this evidence in the
light most favorable to Longs, a reasonable jury could
conclude that McStravick did not believe in good faith that
Longs was absent without leave and that McStravick was
motivated by retaliatory animus when he told Holmes Longs
was absent without leave.   Combined with the potentially
suspicious timing between Holmes' receipt of the EEOC
Notice and the final termination, Longs has presented
evidence that Ford's non-retaliatory reason for the
termination was a mere pretext for intentional retaliation.
See DeBoer v. Musashi Auto Parts, Inc., 124 Fed. Appx. 387,
393 (6th Cir. 2005) ("Suspicious timing is a strong
indicator of pretext when accompanied by some other,
independent evidence . . . .")

A genuine issue of material fact remains on the ultimate issue of whether Longs was terminated in retaliation for his protected activities.  Accordingly, as to Longs' retaliation claim, Ford's motion for summary judgment is DENIED.

**IV.   CONCLUSION**

Ford's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  With respect to the discrimination claims, Ford's Motion is GRANTED.  With respect to the retaliation claim, Ford's Motion is DENIED.


SO ORDERED this 10th day of August, 2009.


/s/ JON P. McCALLA
Chief United States District Judge